LOGAN MATTHIS, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. A verdict in accordance with the evidence will be maintained.
2. Where the presiding Judge correctly charged the jury as to the law of reasonable doubts in criminal cases, and the jury finds against the prisoner, their finding will not be disturbed on the ground that they disregarded the charge of the Court, unless it made to appear that the jury, or some of the jury, entertained no reasonable doubt of the prisoner's guilt.
3. A witness cannot be impeached by proof that he has made statements out of Court at variance with his testimony on the trial, unless a proper foundation be first laid for such impeachment, by asking the witness himself, as to the time, place, and person involved in the proposed contradiction.
4. An unsuccessful attempt to impeach a witness, though in violation of law, furnishes no ground for a new trial.
5. A new trial will not be granted, on the ground of newly-discovered evidence, where there has been a great want of diligence in ascertaining the facts, and obtaining the testimony.

Indictment for murder, in Calhoun Superior Court, tried before His Honor ALEXANDER A. ALLEN, at March Term, 1861.

At the March Term, 1861, of Calhoun Superior Court, a bill of indictment was found and filed, charging Logan Matthis and Hillary Matthis, with the crime of murder, in taking the life of Everett Matthis, in said county, on the first day of March, 1861.

Logan Matthis was charged as principal in the first degree,

and Hillary Matthis as principal in the second degree, in said offence.

At the same term of the Court, Logan Matthis was put upon his trial, and the following testimony was adduced, to wit.

Mrs. ELIZA D. KENDRICK, witness for the State, testified: that her attention was attracted by some loud talking and cursing, and upon looking in the direction of the noise, which was some sixty yards off, she discovered prisoner and deceased walking together arm in arm, apparently friendly; they suddenly separated, and prisoner asked Hillary Matthis for a pistol, which was given to him, and with it he shot deceased; that the shooting occurred in said county, in March, 1861, and produced the death of the deceased; that at the time he was shot, the deceased was standing still, and making no effort to strike or injure the prisoner or any one else; that deceased had no knife or other weapon in his hand that the witness could see, and she thinks that if deceased had had a knife, she could and would have seen it; after the shooting, the prisoner went off one way, and the rest of the company went another, leaving deceased alone.

SAMUEL T. BROWN, a witness for the State, testified: that he saw prisoner shoot deceased with a pistol; that when deceased was shot he was standing still, or rather reeling first one way, and then the other, as a drunken man would do; that deceased had a small stick, about the size of a man's thumb, in his right hand; he had no knife in his hand; witness was the first to go to deceased after he was shot; immediately after the shooting Hillary Matthis and George Matthis went off one way and prisoner ran off another way; none of the Matthises approached deceased after he was shot; deceased had the little stick with the larger end in his right hand when witness went to him.

JOHN HASTY, a witness for the State, testified: that in his opinion the pistol produced is the one prisoner had the night after the shooting.

JOSEPH ELLIS, a witness for the State, testified: that on the day of the homicide, and before it occurred, he heard the

prisoner say that he intended to tell the deceased, that he was a God-damned rascal before the following Monday morning, and more than that, he was going to kill deceased before the following Monday morning, or the next week, anyhow; prisoner then had a pistol with three loaded barrels, which was very like the one produced in Court; prisoner appeared cool and rational when he made the threats, and a short time thereafter walked off, arm in arm with deceased.

GEORGE MATTHIS, in behalf of defendant, testified: that the witness, Hillary Matthis, and the old man had started home, and as they were going along prisoner and deceased came on behind them, arm in arm; that he heard the lie pass between them, and deceased wrung loose from prisoner and fell to cutting at him with his knife; prisoner then demanded his pistol from Hillary Matthis as many as three times, and finally snatched it out of his hand, and told deceased, that if he kept coming on him he would 'kill him; that prisoner, after backing four or five steps, fired the pistol, the deceased being right at him, cutting at him with the knife; that after the shooting prisoner ran off, and the witness and the other Matthises went off home; that deceased, when he was shot, had a stick in his left hand, upon which he leaned whilst he was cutting at prisoner with the knife; deceased did not cut prisoner.

H. L. SHAGGS, in behalf of defendant, testified: that a short time before the homicide prisoner and deceased passed by him, and after a little time they began to talk loudly and angrily; witness looked to see what was the matter, and saw them pulling off their coats to fight, and heard them cursing and swearing at the same time; the deceased was popping his fist in his hand and stepped up to prisoner, and prisoner stepped back and fired; as the pistol fired deceased clapped his hand to his bosom and hallooed, and sat, or fell back on a log; after the shooting prisoner ran off round Dr. Kendrick's residence, and the other Matthises went off another road; when deceased was popping his fist he did not strike as if he desired or intended to hurt, but kept advancing on prisoner.

GEORGE W. ARNOLD, in behalf of defendant, testified:

that he took an unopened knife out of deceased's pocket the same evening he was shot, and after the shooting; the blade was two and a half or three inches long.

Dr. R. T. KENDRICK, in rebuttal for the State, testified: that deceased was carried to his office after he was shot, and that he did not examine or search his pockets for a knife, but that he felt nothing heavy in either of them.

When George Matthis was being examined as a witness he was asked the question, "who has talked with you about this case, or who have you talked with about it?" to which he answered, "no one has been talking with me about what I would testify."

For the purpose of discrediting or impeaching the said George Matthis, the State offered William Fain as a witness, to prove that on Monday after the homicide, he had a conversation with George Matthis about the facts of said homicide, and that he, Matthis, then said, that prisoner and deceased were walking together, arm in arm, some fifteen steps behind him; that when they got near him they tore loose from each other, and deceased commenced cutting at prisoner and prisoner shot him, but that he, Matthis, did not see the shooting, as his back was to the parties at the time; that Matthis' statement was in answer to a direct question by Fain, as to whether or not he saw the shooting.

Counsel for prisoner objected to this evidence to impeach Matthis, because a sufficient foundation had not been laid therefor, but the Court admitted the evidence, and defendant excepted. Prisoner then introduced three witnesses, who testified, that they were acquainted with the character of George Matthis for truth and veracity in the neighborhood in which he lived; that he was regarded as truthful, and that they would believe him on his oath in a court of justice.

The jury found the defendant guilty of willful murder, and his counsel moved for a new trial on the grounds:

1st. That the verdict was contrary to law, contrary to evidence, and against the weight of evidence.

2d. That the verdict was contrary to, and in disregard of, the following charge of the Court, to wit: "that the defend-

ant was entitled to the full benefit of any reasonable doubt the jury might have of his guilt; that such doubt usually arises from the absence of evidence, or from a conflict of evidence; and that, should the jury have any such reasonable doubt as to the guilt of the defendant, they should not find him guilty."

3d. That the Court erred in admitting the testimony of William E. Fain, to impeach the witness George Matthis, as hereinbefore stated.

4th. That after the trial, the prisoner had discovered new evidence, which would go to show that the homicide was justifiable, of which evidence he had no knowledge until after the trial.

In support of the last ground taken in the motion for a new trial, counsel for the prisoner produced the affidavits of David Merritt and Wright Merritt, stating that they were well acquainted with the deceased, and that when intoxicated or angry, he was a dangerous man; that he usually carried about him a large knife, and when angry would draw and use it; that from their knowledge of his character for violence, they would consider a man in danger in a difficulty with deceased, when he had a knife about him, and was mad or drunk; and that prisoner must, from his familiar acquaintance with deceased, have known of his violent and dangerous character.

Prisoner also produced his own affidavit, stating, that from the day of the homicide to the day of trial, he had been confined in jail, was poor, and unable to employ counsel to assist in preparing his defence, and was wholly unlearned in the law; and that he was not aware of the evidence of the Messrs. Merritt until after the trial, nor of its importance in his case; and that if he can obtain a new trial, he has reason to believe that he can make his innocence of criminal intent abundantly manifest.

The presiding Judge refused the new trial, and the prisoner asks a reversal of that judgment, on the ground of alleged error in the same.

VASON & DAVIS, and H. F. ROBSON, for plaintiff in error

W. E. SMITH, Solicitor General, *contra.*

*By the Court*—Jenkins J., delivering the opinion.

There can be no doubt that the plaintiff in error committed the homicide with which he is charged, and the jury found him guilty of murder. This finding, it is said, was contrary to law and evidence, and against the weight of evidence. There was an attempt to prove by one of the witnesses, that the deceased assailed the accused with a large knife and attempted to do a serious personal injury. But upon this point the evidence is conflicting, and our opinion is, that the weight of evidence is strongly and decidedly against the accused. We therefore concur with the Court below in overruling the first ground for a new trial. It is urged further, that the verdict is contrary to that portion of the charge of the Court which instructed the jury, "that the defendant was entitled to the full benefit of any reasonable doubt they might have of his guilt."

The charge was undoubtedly correct, but we have no means of arriving at the conclusion, that any of the jury entertained such reasonable doubt, and cannot, therefore, perceive that they disregarded the charge.

The impression made on our minds, by the evidence, is not such as to satisfy us that they (the jury) must necessarily have entertained doubts of the guilt of the accused.

1. The foundation for the impeachment of the witness, George Matthis, by proving declarations made by him in conversation with another, was not laid in accordance with the rule of evidence. The witness, Matthis, was simply asked with whom he had conversed relative to the case, and what he had said in such conversations. In 1st Greenleaf, Section 462, the rule in such cases is thus given: "Before this can be done" (the proof of statements not under oath) "it is generally held necessary, in case of verbal statements, first to ask him," (the witness sought to be impeached) "as to

the time, place and person involved in the supposed contradiction. It is not enough to ask him the general question, whether he has ever said so and so, nor whether he has always told the same story," etc.

In support of which the learned author cites Angies vs. Smith, 1 M. & M., 473; Crowley vs. Page, 7 C. & P., 789; Regina vs. Shellard 9, C. & P., 277; Regina vs. Holden 8, C. & P., 606; Palmer vs. Haight 2, Barbour's S. C. R., 210.

To the same effect is the answer of the Judges, per Abbot, C. J., to the House of Lords, in the Queen's case, 2 Brod. & Bing, 313. The rule, as given by Mr. Greenleaf, has heretofore been adopted by this Court. Wright vs. Hicks, 15th Ga., 160.

There must be a general or substantial compliance with this rule, to authorize the admission of the impeaching evidence. Nevertheless, we do not regard the error of the Court below, in this particular, as of sufficient moment to justify a reversal of the judgment.

The attempt to impeach George Matthis, by the witness Fain, was a failure. The testimony of Matthis and his statement to Fain agree in the main. The difference consists in the fact that there is more of detail in his testimony than in his conversation, doubtless produced by interrogation on the stand, and in the statement to Fain in answer to a distinct question, that he did not see the shooting, his back being turned at the moment. Yet before Fain put this question, Matthis stated to him, as he did in Court, that "when the parties tore loose from each other, deceased commenced cutting at prisoner, and prisoner shot him." Doubtless had the question put by Fain been put to him in Court, witness would have answered the same way. If it be said that this illegal evidence of Fain prejudiced the testimony of Matthis by representing him as testifying to what he did not see, the reply is that the facts secure him against any imputation of falsehood on that score.

What were the facts? Matthis had witnessed a quarrel between the parties still in progress. He saw prisoner take a pistol from H. Matthis, for the avowed purpose of shoot-

ing deceased—he heard the report of but one pistol—and deceased, and he only, was shot. The conclusion from all this was so clear (I may say inevitable) that prisoner shot deceased, that false swearing could hardly be imputed to the witness for asserting that he did so, though at the moment he may have been looking another way. The general agreement between Matthis' testimony and his statement to Fain, and the success of the effort to sustain him by proof of his general character must have had the effect of strengthening his testimony in the estimation of the jury. An unsuccessful attempt to impeach a witness, though in violation of law, furnishes no grounds for a new trial.

Again, had there been no attempt to impeach George Matthis, we think the testimony of other witnesses would have justified the jury in concluding that he was mistaken in his statement that deceased was cutting at prisoner with his knife when prisoner shot him. Believing, therefore, that putting the testimony of Fain out of the question, the evidence in the case supports the verdict of the jury, we are constrained by former adjudications to sustain the Court below in refusing a new trial on this ground. 1 Ga. R., 580; 10, Ibid., 209–253; 11 Ibid., 331–14; Ibid., 43 and 145.

3rd. The showing made to support the application for a new trial, on the ground of newly discovered evidence, was not satisfactory to the Court below. It consists of evidence that the deceased, when intoxicated, or angry, was a violent man, and usually carried with him a large knife, which, at such times, he would draw, and was inclined to use, and that this must have been known to prisoner, as he was well acquainted with deceased; and that affiants did not communicate their knowledge of these facts to the prisoner's counsel until after the trial.

Prisoner himself swore that he did not know of this evidence of David Merritt and Wright Merritt (the two affiants above referred to) until after his trial, and did not know of the importance of such evidence to him. He does not say that he did not know that such was the character of de-

ceased, nor that evidence to that effect could not be procured at the trial.

There was a manifest want of diligence on the part of the prisoner in the preparation of his case on this point. If such were the character of deceased, with his proclivity to drunkenness, it must have been pretty generally known in the neighborhood, and it is scarcely conceivable that no witness could be found to the point at the time of the trial. Either the prisoner knew that deceased was such a man, or he did not know it. If he did not know it, the evidence could not avail him, for then his justification must depend upon what actually transpired at the time of, and immediately preceding the homicide.

If he did know it, he should have adduced evidence of it on the trial, or if that was not attainable, by reason of the short interval between the homicide and the trial, he should have applied for a continuance, to enable him to procure the evidence. It cannot be supposed that an appeal to the discretion of the Court below for a continuance, to enable the accused to obtain any evidence important to his defense, not then attainable, would have failed of success. Persons charged with crime cannot be permitted to elect, unprepared, to hazard a trial, and then, if convicted, to procure a new trial, because a fact known to exist had not been proven on the trial, thus multiplying the chances of escape, speculating on the uncertainties of law, and mocking its majesty. It is not enough that the prisoner did not know the importance or materiality of this evidence, or that he was unlearned in the law. He had counsel learned in the law, whose knowledge he appealed to for the supply of his lack. If the desperate or dangerous character of the deceased really influenced his conduct during the fatal rencounter, he was not likely to overlook or underrate it in conference with his counsel, touching the preparation of his defense.

In such conferences, he owed it to himself and to his counsel full and unreserved disclosure of all he knew concerning his case. If he withheld a fact, upon the knowledge of which he had acted in dealing the death wound, (for in that knowl-

edge and its controlling influence upon him at the critical moment, consists the strength of this appeal,) then he was wanting either in diligence or fair dealing, and must take the consequences.

The administration of the law should not be defeated, delayed, or turned aside by the neglect, caprice or cunning of persons charged with crime. 9 Ga., 4; 10 Ga., 511; 11 Ga., 33.

The motion, we think, was properly overruled.

Let the judgment be affirmed.